NEW ENGLAND MERCHANTS NATIONAL BANK vs. JOHN W.
SPILLANE, guardian
(and a companion case[1]).

Worcester. April 15, 1982. — November 24, 1982.

Present: GRANT, GREANEY, & SMITH, JJ.

*Probate Court, Guardian. Guardian.*

This court considered the appropriateness of the appointment of an attorney as temporary and permanent guardian of an elderly woman, notwithstanding the woman's death subsequent to its hearing appellate argument in the case, where the proceeding raised questions of public importance and capable of repetition, but which would otherwise evade review. [687-688]

A probate judge, purporting to act under G. L. c. 201, § 14, erred in appointing an attorney as the temporary guardian of an elderly woman, where he made no finding that the woman's welfare required the immediate appointment of a temporary guardian and where the record did not indicate that she was incapable of handling her affairs by reason of mental illness. [688-691]

A probate judge's appointment of a temporary guardian for an elderly woman, at a time when no petition for the appointment of a permanent guardian had been filed, was premature in light of Rule 29B of the Probate Court (1975). [688-691]

Where, in a Probate Court proceeding for guardianship of an elderly woman whose condition had rendered her incapable of expressing her wishes, the petitioners had presented substantial evidence of the suitability of a certain bank, to be guardian of her property, and her close friend, to be guardian of her person, the judge erred in appointing an attorney unknown to the ward as guardian of her person and coguardian of her property, in the absence of any evidence as to the attorney's suitability or any statement of the judge's reasons for appointing him. [692-694]

[1] Howland Warren & others vs. John W. Spillane, guardian.

PETITIONS filed in the Worcester Division of the Probate and Family Court Department on September 23, 1980, and December 31, 1980, respectively.

The cases were heard by *McManus, J.*

*Jeffrey F. Jones* (*Kathleen C. Farrell* with him) for New England Merchants National Bank & others, petitioners.

*John W. Spillane,* guardian, pro se.

SMITH, J. These are two appeals from decisions of a Worcester County probate judge appointing John W. Spillane, a Worcester attorney, first as temporary and later as permanent, guardian of Miriam Shaw (Miss Shaw). The case began when the New England Merchants National Bank (bank) petitioned to be appointed conservator of Miss Shaw's property. See G. L. c. 201, § 16. The judge appointed Mr. Spillane, a lawyer with offices in Worcester, as guardian ad litem to represent the interests of Miss Shaw on the petition. Subsequently, Mr. Spillane assented to the petition of the bank for the appointment of it as conservator. On December 4, 1980, however, the judge, on his own motion, appointed Mr. Spillane as Miss Shaw's temporary guardian.[2] In February, 1981, the bank moved to discharge the temporary guardian; that motion was denied, and the bank has appealed.[3]

Subsequently, a guardianship proceeding was commenced on December 31, 1980, by Howland Warren, Ignatius Sargent and Keyo Russell[4] (petitioners), who moved for the appointment of the bank as guardian of the property and Nancy L. Brown (Mrs. Brown) as guardian of the person of Miss Shaw. After an evidentiary hearing, the pro-

---

[2] No action was ever taken on the bank's conservatorship petition.

[3] The petitioners identified in n.4 hereof joined in the motion of the bank to discharge the temporary guardian, and they also have appealed from the judge's decision.

[4] Howland Warren was Miss Shaw's cousin and presumptive heir. Ignatius Sargent was a friend of Miss Shaw who had lived with his mother in Miss Shaw's home for a number of years. Keyo Russell was a friend and neighbor. Miss Shaw's other presumptive heirs, Richard Warren and Mary Warren Murphy, both cousins of Miss Shaw, assented to the proposed guardianship.

bate judge entered a judgment appointing Mr. Spillane as "[p]ermanent [g]uardian of the person of [Miss] Shaw" and the bank as "[c]o-[g]uardian of Miss Shaw's property, except the house in Harvard." The petitioners have appealed from this judgment.[5]

We must first dispose of an issue that arose during the course of the appeals. After the court heard oral arguments in the case, Miss Shaw died. As a result of her death, there is no continuing issue as to the appropriate person or entity to serve as guardian. Mr. Spillane has moved to dismiss the appeals as moot. The bank and the petitioners contend that, regardless of the death of Miss Shaw, the court should issue a decision. For reasons that will appear shortly, we agree with the bank and the petitioners, and deny Mr. Spillane's motion.

One of the questions raised by the appeals is the propriety of the appointment of a person, as temporary or permanent guardian, whose only qualification for those positions, according to the record before us, is that he is a member of the local Bar. Therefore, this matter is of public importance, especially in view of the number of guardianship petitions that are brought in Probate Courts on behalf of elderly or infirm persons who, like Miss Shaw, may not survive the period of time necessary to obtain appellate review of a decision by a probate judge appointing a person or entity as a guardian. In addition, an appointment of a temporary guardian expires after ninety days, see Rule 29B of the Probate Court (1975), a period too short to permit effective review. On several occasions when the question of mootness has been raised, our appellate courts have elected to render decisions on matters of public importance which are likely to recur but would otherwise evade review. *Superintendent of Worcester State Hosp.* v. *Hagberg,* 374 Mass. 271,

---

[5] The bank and the petitioners filed motions to consolidate these two cases on appeal. A single justice allowed the bank and the petitioners to file a joint brief, ordered them to file separate but jointly bound appendices, and deferred the motion to consolidate the panel of Justices assigned to determine the appeals. We allow the motion.

274 (1978). *Ghiglione* v. *School Comm. of Southbridge,* 376 Mass. 70, 72 n.5 (1978). *Commissioner of Correction* v. *Myers,* 379 Mass. 255, 261 (1979). In addition, the issues have been fully briefed and argued to us in an adversary proceeding. *Superintendent of Worcester State Hosp.* v. *Hagberg, supra. Commissioner of Correction* v. *Myers, supra.* Therefore, we think that it is appropriate that we express our opinions.

We summarize the facts. The facts are drawn from the hearing relative to the guardianship proceeding and are not in dispute. At the time of the guardianship proceeding hearing, Miss Shaw was ninety-two years old, and, as a result of a series of strokes, was confined to her bed at her home in Harvard. Prior to her illness she had led an active, fruitful life. Born to wealth, Miss Shaw had had business and fiduciary relationships with the bank and one of its corporate predecessors since 1920. The bank managed her agency account which was worth approximately $350,000 at the time of the hearing. In addition, Miss Shaw had appointed the bank as trustee of an irrevocable trust which had been established by her in 1955 for the benefit of ten annuitants. Miss Shaw's total annual income was approximately $378,000 and was obtained in large part from three testamentary trusts, two of which had been established by her grandparents and were managed in part by the bank as cotrustee.[6]

In 1946, Miss Shaw had executed a general power of attorney which authorized one of the bank's corporate predecessors to act on her behalf with respect to her property and financial affairs. Until the temporary guardian was appointed in 1980, the bank had used the power of attorney to provide for Miss Shaw's needs.

Beginning in 1978, Miss Shaw suffered a series of strokes which left her totally incapacitated. She was confined to

---

[6] At the time of the hearing, the two trusts managed by the bank were valued at $7,000,000. The third trust, which did not involve the bank, was valued at approximately $200,000.

her bed in her residence in Harvard, and because of her condition, needed continuous nursing care. The strokes had deprived her of speech and her only method of communication, if she communicated at all, was by eye movements and facial gestures. As her condition worsened, the bank became reluctant to continue to use the power of attorney as the basis for handling her affairs, and, after consulting Dr. Jeffrey Harris, her personal physician for many years, petitioned the Probate Court to be appointed conservator of Miss Shaw's property. See G. L. c. 201, § 16. A medical certificate was signed by Dr. Harris and filed, stating that Miss Shaw was incapable of caring for herself and her estate by reason of advanced age, mental weakness, and physical incapacity. Mr. Spillane was appointed guardian ad litem by a probate judge, assented to the petition of the bank for appointment as conservator, and recommended in his report that the judge consider appointing a guardian "as an assist to the bank in its role as conservator and generally for the best interests of Miss Shaw."[7]

1. *The temporary guardian issue.* On December 4, 1980, the judge, acting on his own motion, appointed Mr. Spillane as temporary guardian of Miss Shaw. On February 17, 1981, the bank and the petitioners filed a motion to discharge the temporary guardian. On April 27, 1981, the judge denied the motion without a hearing. On appeal, the bank and the petitioners argue that the judge lacked authority to appoint a temporary guardian and that, in any event, Mr. Spillane should have been discharged because his actions as temporary guardian were inappropriate and in excess of his authority.

a. *The authority of the judge to appoint a temporary guardian.* All the parties, including Mr. Spillane, agree that the judge purported to act under G. L. c. 201, § 14, as amended through St. 1977, c. 567, § 3, in appointing Mr. Spillane as temporary guardian. That statute establishes

---

[7] Mr. Spillane received $1,000 for his labors as guardian ad litem. The record does not disclose what compensation he may have sought for his efforts as temporary or as permanent guardian.

certain procedural requirements that must be met before a judge may appoint a temporary guardian. These include a finding that the welfare of the proposed ward requires a guardian's immediate appointment. *Fazio* v. *Fazio,* 375 Mass. 394, 404 (1978). *Guardianship of Roe,* 383 Mass. 415, 429 (1981). Such a finding is absent from the order issued by the judge appointing the temporary guardian. That omission was not an oversight, because there was nothing contained in Dr. Harris' medical certificate or in the report of the guardian ad litem that indicated an emergency was at hand or that the welfare of Miss Shaw otherwise required an immediate appointment of a temporary guardian. In addition, there was nothing before the judge when he appointed Mr. Spillane to show that Miss Shaw was incapable of handling her affairs because of mental illness. *Fazio* v. *Fazio, supra.* Dr. Harris' medical certificate that accompanied the conservatorship petition stated that Miss Shaw was incapable of caring for herself and her estate by reason of "mental weakness." The phrase "mental weakness" may be sufficient to permit a judge to appoint a temporary conservator under G. L. c. 201, § 21, but it is not sufficient to warrant the appointment of a temporary guardian under G. L. c. 201, § 14.

Because the probate judges are sensitive to the importance of any decision relative to the appointment of a temporary guardian, they have adopted Rule 29B of the Probate Court (1975) which establishes additional procedural requirements. The rule states, in pertinent part, that "[n]o temporary appointment of a guardian or conservator will be allowed unless a permanent petition has been filed and is being prosecuted." At the time of the appointment of the temporary guardian, no petition for the appointment of a permanent guardian had been filed. At the very least, it was premature of the judge to appoint a temporary guardian before any person sought the appointment of a permanent guardian.

Because of the failure of the judge to make the critical finding that the welfare of Miss Shaw required the immedi-

ate appointment of a temporary guardian, the lack of any indication in the record that Miss Shaw was incapable of taking care of herself because of mental illness, and the judge's premature action, the appointment of the temporary guardian was error and the motion to discharge the temporary guardian should have been allowed forthwith.

b. *The actions of Mr. Spillane as temporary guardian.* After holding the appointment of the temporary guardian was error, we would not, in the usual course, examine the conduct of the temporary guardian during his flawed appointment. In this instance however, an examination of Mr. Spillane's conduct as temporary guardian is relevant to the propriety of his appointment as permanent guardian. The bank and the petitioners claim that Mr. Spillane's actions as temporary guardian were inappropriate and unauthorized and that a cursory examination by the judge of the two reports submitted by Mr. Spillane in his role as temporary guardian would have revealed that Mr. Spillane has far exceeded the limited duties imposed on him by the judge's order.

In the order appointing him as temporary guardian, Mr. Spillane was instructed to report on the physical and mental condition of Miss Shaw. He was authorized "to employ necessary medical assistance to inform [the] [c]ourt whether . . . [Miss] Shaw is able to give informed consent concerning her assets and her person." Mr. Spillane was further instructed to prepare for the court "a résumé of her finances and of the present living conditions." Following the order of the judge, Mr. Spillane obtained the services of a medical doctor who submitted a detailed report in regard to the ability of Miss Shaw to give her informed consent concerning her assets and her person. He also prepared a resume of Miss Shaw's finances and of her living conditions. These actions were in accordance with the order of the judge.

Other actions of Mr. Spillane as temporary guardian, however, exceeded the limits set on him by the judge's order. He compiled a genealogical history of the family of Miss Shaw and included it in one of his temporary guardian's

reports with copies of letters written by Miss Shaw's fore-bears during the Civil War. He made arrangements for the house to be painted. He authorized the gardener to hire a full-time assistant. He requested the bank to allocate $4,000 from Miss Shaw's funds to pay for two semesters at a nursing school for a young woman who had been with Miss Shaw for a number of years. He retained an investment counselor to assist in reviewing Miss Shaw's investments and, as a result of the review, requested the bank to "re-evaluate its portfolio position and prepare a plan for the realignment of investments which will be short-term in nature and yield higher income."

No order of the judge authorized Mr. Spillane to under-take any of those activities. The actions of Mr. Spillane were contained in the two reports that he submitted as tem-porary guardian. The reports were exhibits at the hearing on the petition to appoint permanent guardians. At the very minimum, the reports should have alerted the judge that Mr. Spillane was mistaken in regard to his role with respect to the affairs of Miss Shaw; and, therefore, the judge should have considered Mr. Spillane's actions as temporary guardian in determining whether he was a suitable person to be appointed as permanent guardian.

2. *The appointment of the permanent guardian.* On December 31, 1980, the petitioners moved for the appoint-ments of the bank as the permanent guardian of Miss Shaw's property and Mrs. Brown as the permanent guardian of the person of Miss Shaw.[8] A medical certificate, signed by Dr. Harris, accompanied the petition and stated that Miss Shaw was a mentally ill person and incapable, by reason of advanced age and mental weakness, of caring for herself and her estate. Mr. Spillane, in his second report as tem-porary guardian, vigorously opposed the petition and adopted an adversary role throughout the hearing. After the hearing the judge entered a judgment appointing Mr. Spil-

---

[8] The petition contained the phrase, "or some other suitable person," after the bank's and Mrs. Brown's names.

lane as permanent guardian of the person of Miss Shaw and appointing the bank as "[c]o-[g]uardian" with Mr. Spillane, of Miss Shaw's property, except for the house in Harvard. The bank and the petitioners argue on appeal that the judge erred in rejecting Mrs. Brown. They contend the evidence that she was a "suitable person" was overwhelming and that, by contrast, there was no evidence introduced at the hearing that Mr. Spillane was a "suitable person" and that, in fact, his conduct as temporary guardian was strong evidence that he was not a suitable person to be appointed permanent guardian.

A probate judge has substantial discretion in guardianship matters. *Gloucester* v. *Page*, 105 Mass. 231, 232 (1870). *Guardianship of Bassett*, 7 Mass. App. Ct. 56, 64 (1979). The power is not without limits, and the court must exercise its power with a view to the best interests of the ward. See *King* v. *Dolan*, 255 Mass. 236, 237 (1926). In addition, the person appointed must be found to be suitable to serve as guardian. See *Harding* v. *Brown*, 227 Mass. 77, 86 (1917); *Curran* v. *Carroll*, 318 Mass. 780 (1945).

At the hearing the bank and the petitioners introduced substantial evidence as to the suitability of Mrs. Brown and the bank to serve as permanent guardians. The uncontradicted evidence was that Mrs. Brown, a graduate of Smith College and mother of six children, had been a friend and neighbor of Miss Shaw for several years. Two affidavits were filed and received in evidence by the judge. In the first affidavit, the minister of the church that Mrs. Brown and Miss Shaw attended stated that it was his belief that "Miss Shaw would desire the appointment of a trusted friend and advisor" and that "Mrs. Brown would be an excellent choice." The affidavit further recited that Mrs. Brown had maintained a "constant and faithful relationship with Miss Shaw for many years." The second affidavit was of a former selectman of Harvard, and he also attested to the close relationship between Miss Shaw and Mrs. Brown. Mrs. Brown testified that she would consider it an honor to be appointed permanent guardian of Miss Shaw's person

and that she would serve without compensation.[9]   There was no evidence offered or received in regard to the suitability of Mr. Spillane.

As already noted, Miss Shaw had been rendered mute by a series of strokes. When, as here, a ward is incapable of expressing an opinion or preference as to a guardian, a judge should try to ascertain as best as he can what the ward's desires would be. Cf. *Doe* v. *Doe*, 377 Mass. 272, 278-279 (1979). On the record, Miss Shaw's presumptive heirs, her personal physician for many years, her minister, and a person who had lived in her home for years, all urged or assented to the appointment of Mrs. Brown, a friend and neighbor of Miss Shaw. In contrast, Mr. Spillane was a stranger to Miss Shaw before his appointments in these cases. No one petitioned or argued for his appointment as permanent guardian. The record is silent as to any particular expertise that Mr. Spillane possessed relative to the handling of affairs such as those of Miss Shaw. To the contrary, the record indicates that some of Mr. Spillane's actions during his brief tenure as temporary guardian were misguided and inappropriate.

In sum, implicit in the judge's appointment of Mr. Spillane is a finding that Mr. Spillane was a suitable person to be appointed permanent guardian. There was nothing in the record, however, that justified such a finding. We hold that where a judge appoints a guardian under G. L. c. 201, §§ 6 & 6A, and that person is not requested by the petitioners, there must be presented on the record evidence as to that person's suitability. Further, the judge should state with particularity his reasons for the appointment of the substitute person.

---

[9] There also was substantial evidence as to the suitability of the bank to be appointed permanent guardian of Miss Shaw's property. We do not recite that evidence, as the judge found that the bank had handled Miss Shaw's affairs satisfactorily and, in any event, we vacate the judge's appointment of Mr. Spillane as permanent guardian.

We hold that it was error for the judge to appoint a temporary guardian and that it was error to appoint Mr. Spillane as permanent guardian. Both appointments are vacated.

*So ordered.*